UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

                    Plaintiff,

          v.

TINA MCDONALD,

                    Defendant.

_____

REPORT & RECOMMENDATION

13-CR-6025CJS

## PRELIMINARY STATEMENT

By Order of Hon. Charles J. Siragusa, United States District Judge, dated September 12, 2013, all pretrial matters in the above captioned case have been referred to this Court pursuant to 28 U.S.C. §§ 636(b)(1)(A)-(B).  (Docket # 34).

On September 9, 2014, the grand jury returned a third superseding indictment against Tyshawn Simmons ("Simmons"), Marquis McMillian ("McMillian"), Franklin Brock, Jr. ("Brock, Jr."), Melvin Hill ("Hill"), Franklin Brock, Sr. ("Brock, Sr."), Patrick Christner ("Christner"), Tina McDonald ("McDonald"), and Ciarra Crane ("Crane").  (Docket # 362). Relevant to this decision, the first count of the ten-count superseding indictment charges all of the defendants, along with Tashaka Mitchum, Schmillion Weaver and Devin Allen-Furtick, with conspiring from January 2006 through April 2013 to possess with the intent to distribute and to distribute heroin, cocaine, cocaine base, and marijuana, in violation of 21 U.S.C. § 846.  (*Id.*).

Currently pending before this Court for Report and Recommendation are McDonald's motions to suppress tangible evidence and statements.[1]  (Docket ## 192 at ¶¶ 4-14; 353).  For the reasons discussed below, I recommend that the district court deny McDonald's motions to suppress tangible evidence and statements.

## FACTUAL BACKGROUND

### I.     July 10, 2014 Arrest of McDonald

This Court conducted an evidentiary hearing on December 9, 2013 and January 23, 2014 concerning the circumstances surrounding McDonald's warrantless arrest and statements she made following that arrest.[2]  (Docket ## 247, 275).  During the hearing, the government offered testimony of Rochester Police Department ("RPD") Investigator Joseph Briganti ("Briganti"), and McDonald offered testimony of her son Treshon Worthey ("Worthey") and Lavonia Dunbar ("Dunbar"), the mother of Worthey's daughter.  (Tr. 3-4, 96-97, 119-20).

#### A.     Testimony of Briganti

Briganti testified that he had been employed by RPD as an investigator in the narcotics division's special investigation section since August 2001.  (Tr. 4).  During the summer of 2012, Briganti was involved in an investigation of Simmons and his associates.  (*Id.*).  On July 10, 2012, Briganti arrested McDonald during the execution of a search warrant at her residence located at 59 Ernst Street, Rochester, New York.  (Tr. 4-5, 65, 70).  According to Briganti, he and other officers arrived at McDonald's residence at approximately 6:50 a.m. that morning.

---

[1]  McDonald filed omnibus motions seeking other forms of relief including, *inter alia*, an audibility hearing, *Brady* material, Rule 404(b), 608 and 609 evidence, *Jencks* material, preservation of rough notes, and leave to file additional motions.  (Docket # 221).  Each of the above-referenced motions was decided by the undersigned or resolved by the parties in open court on October 23, 2013.  (Docket ## 220, 221).

[2]  The transcript of the hearing held on December 9, 2013 and January 23, 2014 shall be referred to as "Tr. __."  (Docket # 340).

(Tr. 9, 65).  Briganti testified that he used a battering ram to enter the premises.  (Tr. 6).  Present

in the house at the time the officers entered were McDonald, two of her sons, her son Treshon's

girlfriend, and her infant grandchild.  (Tr. 8, 98-99).

During the search, the officers discovered and seized clear plastic baggies that

were found under a mattress in one of the upstairs bedrooms.  (Tr. 65-66).  Briganti testified that

the bags were approximately half an inch by half an inch in size and were similar to those used

by narcotics traffickers to package narcotics.  (Tr. 6-7; Government's Exhibits ("G. Exs.") 7A

and 7B).  According to Briganti, the baggies did not contain any drugs or drug residue.

(Tr. 68-69).  Agents also seized a cell phone, mail, and keys.  (Tr. 66).  The search did not

uncover any weapons, illegal narcotics, or cutting agents.  (Tr. 67-68, 83).

McDonald asked the officers why they were in her residence, and Briganti replied

by asking her to accompany him upstairs so that he could explain the officers' presence.  (Tr. 8).

McDonald did so, although she told him that she did not want to talk to him with her children

present.  (Tr. 8, 70).  Briganti informed McDonald that she would be taken to the police station.

(*Id.*).  McDonald was taken into custody and transported to the Public Safety Building, where she

was placed in an interview room.  (Tr. 8, 55-56, 70-71, 88).

McDonald was permitted to use the restroom and, at approximately 9:20 a.m.,

Morales and Briganti began to interview her.  (Tr. 56).  McDonald was not handcuffed at the

time of the interview.  (*Id.*).  Morales and Briganti introduced themselves, engaged in some

"small talk," and then advised McDonald of her *Miranda* rights.  (Tr. 57).  According to

Briganti, Morales read the *Miranda* rights verbatim from a form, the text of which is set forth

below (although Morales substituted the word "you" for the word "I").[3]  (Tr. 57-59; G. Ex. 6).

Morales asked McDonald two questions which were handwritten onto the form.  (Tr. 59).

Specifically, Morales asked McDonald, "Do you understand?"  (Tr. 59; G. Ex. 6).  McDonald

responded, "Yes."  (*Id.*).  Morales then asked McDonald, "Do you agree to talk w[ith] us?"  (*Id.*).

McDonald replied, "Yes, I need to understand what's going on."  (*Id.*).

Following the waiver questions, Briganti and Morales interviewed McDonald for

approximately ninety minutes, during which she cried from time to time.  (Tr. 60-61).  At no

point during the interview did she request a lawyer or make any requests that were denied.  (*Id.*).

The officers did not physically abuse McDonald, and she did not appear to be in any discomfort

during the interview.  (*Id.*).  According to Briganti, neither he nor Morales promised her anything

to induce her to speak; neither told her that she would not be charged with a crime if she

cooperated.  (Tr. 86-87).  Briganti generally asked the questions, and Morales took notes.

(Tr. 61).

After they completed the questioning, Morales prepared a statement reflecting the

substance of the interview.  (Tr. 61-62).  Morales showed the statement to McDonald and read it

aloud.  (Tr. 62).  McDonald made several corrections to the statement, which she initialed.

(Tr. 62-63).  After the corrections were made, McDonald signed every page of the statement.

---

[3]  The form provided:

- I HAVE THE RIGHT TO REMAIN SILENT;
- I DO NOT HAVE TO SAY ANYTHING IF I DON'T WANT TO;
- ANYTHING THAT I DO SAY CAN BE USED AGAINST ME IN A COURT OF LAW;
- I HAVE THE RIGHT TO TALK TO A LAWYER BEFORE I ANSWER ANY QUESTIONS AND TO HAVE THEM HERE WITH ME DURING ANY QUESTIONING IF I WISH;
- THAT IF I AGREE TO TALK ABOUT THIS MATTER WITHOUT A LAWYER PRESENT, I CAN STOP TALKING AT ANY TIME.

(G. Ex. 6).

(Tr. 64; G. Ex. 6).  McDonald was then released.  (Tr. 64).  She had been in police custody for approximately six hours by the time of her release.  (Tr. 71; G. Ex. 5).

Briganti also testified about the status of the Simmons investigation and the basis for McDonald's arrest on July 10, 2012.  According to Briganti, on June 5, 2012, an individual named Rashadd Monson, whose nickname was Scooter, was shot.  (Tr. 10).  Shell casings were collected from the area that Monson was shot.  (*Id.*).  Kamel Lofton witnessed the shooting.  (Tr. 11).  Approximately four days later, on June 9, 2012, Lofton was also shot.  (Tr. 10-11).  Witnesses to both shootings identified McMillian, also known as "Dap," as the shooter.  (Tr. 12, 92).  On June 19, 2012, McMillian was arrested for assault and attempted murder in connection with the June 5, 2012 shooting of Monson.  (Tr. 12).  He was held in the Monroe County Jail, and his phone calls were monitored by investigating officers.  (*Id.*).

Four days before McMillian's arrest, the RPD began intercepting communications over a phone used by Simmons (the "target number") pursuant to court-ordered wiretap authorization.  (Tr. 11, 13).  According to Briganti, he personally listened to or reviewed various intercepted communications prior to July 10, 2012, the date of McDonald's arrest, and testified about some of them, including his interpretation of them.  (Tr. 14-15).

For instance, on June 20, 2012 at 10:50 a.m., a phone call between McMillian and Simmons was intercepted.  (Tr. 15-17, 22; G. Ex. 2).  During the phone call, McMillian stated, "You and Shark can do that," to which Simmons responded, "At the hospital all last night.  I about to run a link up with him right now and do that shit though, bro.  I got you though.  Don't even trip."  (Tr. 16; G. Ex. 2 at 2).  According to Briganti, the investigation suggested that "Shark" or "Sharky" were nicknames for Tashaka Mitchum ("Mitchum").  (Tr. 16).  Later that afternoon at 12:40 p.m., Simmons's phone sent an outgoing text message to a phone number

subscribed to by McDonald. (Tr. 17, 20-21). The message read, "Yo u knw where dap thing at."

(Tr. 17; G. Ex. 2 at 5). Briganti testified, based upon his involvement in the investigation and his

training and experience, that he believed that "[D]ap" referred to McMillian[4] and "thing"

referred to a gun. (Tr. 17-18, 80-81).

Approximately nine minutes later, McDonald's phone texted the target number,

"The same1?" (Tr. 18-19; G. Ex. 2 at 6). One minute later Simmons received a phone call from

McDonald's number. (Tr. 19; G. Ex. 2 at 7). Briganti testified that he recognized Simmons's

voice. (Tr. 20). During the phone call, a female speaker told Simmons, "I'm trying to send you

a message back, but it won't go through. Umm, the same one from before?" (Tr. 23; G. Ex. 2 at

7). Simmons responded, "Umm, yeah," and the female replied, "Yeah, I know where that one

is." (*Id.*). Simmons then said, "Alright, I'm a come, I'll come down there in a minute and talk to

you." (*Id.*).

The following day at 4:53 p.m., Simmons received a call from Mitchum, his

younger brother. (Tr. 24; G. Ex. 2 at 9). Mitchum asked Simmons, "Do you still want me to go

do that … that … uh … at the white girl crib?" (*Id.*). Simmons responded, "Yeah. Go … go do

… yeah, go do that first then go holler at DeJonge." (*Id.*). Briganti testified that he understood

Mitchum's reference to the "the white girl" to mean McDonald. (Tr. 24-25).

One day later, on June 22, 2012 at 6:49 p.m., McMillian, who was being held at

the Monroe County Jail, spoke with an individual named Chauncey Reid ("Reid"). (Tr. 25;

G. Ex. 2 at 10-11). According to Briganti, Reid, whose nickname was "Hands," was a friend of

Mitchum and Simmons. (*Id.*). During the call, the following exchange occurred:

---

[4] Briganti's affidavit in support of the June 15, 2012 wiretap order, which was incorporated by reference into Swain's affidavit dated July 3, 2012 in support of the warrant authorizing the search of 59 Ernst Street (Docket # 192-2 at 4), provides more detail explaining Briganti's knowledge that McMillian's nickname was Dap. (*See* Docket # 219-4 at 32-33).

Reid:        The only person out here is Sharky.  He still (unintelligible).
McMillian:   Right.  I wonder if he went and got my shit that I told him to go get.
Reid:        Your car?
McMillian:   Nah.
Reid:        Talking about the auty right?
McMillian:   Yeah.
Reid:        He probably did.  Where it's at?
McMillian:   It's over there in the hood.
Reid:        On "D" block?
McMillian:   Yeah.

(G. Ex. 2 at 11; Tr. 26-27).  Briganti testified that "Sharky" referred to Mitchum and the word

"auty" referred to a semi-automatic gun.  (Tr. 26, 81).  Additionally, Briganti believed that the

phrase "D block" referred to Durnan Street; he testified that on the date of the call McDonald

lived at 181 Durnan Street.  (Tr. 27, 84).

Reid also told McMillian, "I'm about to go get Sharky … uh … he probably did

(unintelligible)," and McMillian responded, "Yeah.  Have that boy go get that."  (Tr. 27; G. Ex. 2

at 11).  Briganti understood McMillian to be telling Reid that Mitchum should retrieve

McMillian's gun.  (*Id.*).

The following exchange occurred later in the same conversation:

McMillian:   Yeah have Shark get THAT though.  Have him put THAT UP cause yeah…they know it's hot.
Reid:        Does he know exactly where it's at?
McMillian:   Um…The white bitch do.  All you gotta do is ask the white bitch.
Reid:        Oh…oh…oh her?
McMillian:   Yeah.
Reid:        Oh…Oh…oh alright…alright.  I know who you talking about.
McMillian:   Hell yeah but if you can't find Shark shit go…yeah…go grab that shit…
Reid:        We'll go get that and park that shit for you.
McMillian:   Yeah.  Put THAT shit UP.  Yo?

(G. Ex. 2 at 14; Tr. 28-29).  Briganti testified that he understood the term "white bitch" to refer

to McDonald.  (*Id.*).

Approximately three hours later, at 9:49 p.m., law enforcement officers stopped a vehicle in the area of 98 Rauber Street, across the street from Mitchum's residence at 95 Rauber Street.  (Tr. 29, 58).  Reid was in the front seat, and Mitchum was in the back seat.  (*Id.*).  The officers seized a 40 caliber pistol from Reid's pants. (*Id.*).  According to a laboratory report dated June 27, 2012, the firearm seized from Reid had been used to expel the shell casings found in the area of the Monson shooting.  (Tr. 30-31; G. Ex. 3).

Two days later, on June 24, 2012 at 3:28 p.m., McMillian placed a phone call from the Monroe County Jail and spoke to an individual whom Briganti was able to identify as Simmons.  (Tr. 31-32; G. Ex. 2 at 15).  The following exchange between McMillian and Simmons took place during the call:

| | |
|---|---|
| Simmons: | What up man…you…you okayed that bullshit? |
| McMillian: | What? |
| Simmons: | Wit um….wit um….wit um….two dummies |
| McMillian: | Huh? |
| Simmons: | I said you okayed that shit from white girl… |
| McMillian: | Wit Shark? |
| Simmons: | Man…. |
| McMillian: | My mom told you to tell Shark to go YEAH |
| Simmons: | You aint never tell him….you aint never tell him with nobody else… you aint never talked to um…the mother fuckin um…to the other little nigger? |
| McMillian: | Nah, Sharks supposed to when he YEAH and put that YEAH…(pause)  Why, what's up with them niggers man? |
| Simmons: | Man…. |
| McMillian: | Where's Sharkey at man? |
| Simmons: | He probably at the crib.  Call…Call my uncle…but…..man…. |
| McMillian: | Alright…alright…boom. |
| Simmons: | Mother fucking little bro….Not Trey's, your little Bro. |
| McMillian: | Sticky Fingers? |
| Simmons: | Right. |
| McMillian: | Yeah… |
| Simmons: | Sticky Fingers supposed to have it? |
| McMillian: | Nah….Sharkey. |
| Simmons: | Man….somehow Sticky Fingers had it.  Like, them niggers tellin me that they talked to you, you said it was alright for Sticky Fingers to have it. |

|  |  |
|---|---|
| McMillian: | No. |
| Simmons: | Sticky Fingers got….Sticky Fingers got…. |
| McMillian: | Nah, Sharks' supposed to a got that shit, man… |
| Simmons: | Boy Sticky Fingers done got it….. |
| McMillian: | Wher[e] did Stickey Fingers get that? |
| Simmons: | I don't know, check with the (inaudible)… I don't know If he's down there or what….wether he got knocked off with it |
| McMillian: | Huh? |
| Simmons: | Man..…Right, that's my whole thing of why I'm askin you did…you isn't say anything bout that shit…. He said you niggers talk….call…listen….in his convers…call… call my other phone right now, it's at 851-9713 man….cause you …… that shit….you got… |
| McMillian: | Call off your junk, three way off your junk, cause my grandma put the phone down. |

(G. Ex. 2 at 16-17; Tr. 32-34).  Briganti testified that he believed that the phrase "white girl" referred to McDonald, the phrase "the little nigger" referred to Reid, who was a minor at the time of the conversation, and the nickname "Sticky Fingers" also referred to Reid.  (Tr. 40-41).

After that exchange, McMillian spoke to his grandmother and directed her to call 851-9713, a number Briganti knew to be associated with 95 Rauber Street.  (Tr. 34-35).  Briganti testified that Mitchum and McMillian engaged in the following conversation:

|  |  |
|---|---|
| McMillian: | Yo Shark…. |
| Mitchum: | Yeah I hear you bro... |
| McMillian: | What's up son? |
| Mitchum: | Shit. |
| McMillian: | Man…why you ...dang…yo what's up man? |
| Mitchum: | Bro, Do you want me to explain this shit? |
| McMillian: | Hell yeah….Cause I pacifically told Ty you .…you…you and YEAH..…how the fuck little bro YEAH..…What's up son.… |
| Mitchum: | You know…you know what he said. |
| McMillian: | Huh? |
| Mitchum: | You know what little…you know what little bro did …little bro did he talked to you and you told him off.  Which I.... Which…which…which you got to understand is believable on my part cause how the fuck he know that if it was me. |
| McMillian: | Hell nah, I told that nigger to tell you to go YEAH, and I then told Ty to tell you to YEAH …. |
| Mitchum: | He said he done YEAH. |

9

| | |
|---|---|
| McMillian: | I told him get with you ….I told him well you get with him, take him straight to go YEAH …. And take him to YEAH…. |
| Mitchum: | Ya, that's not ...that's not what he told me bro.  He told me that you said YEAH. |
| McMillian: | So who he was with?  He was (inaudible), when shit hit the fan? |
| Mitchum: | No, it was me,….. him,….. my baby,….. my baby mom and Dee. |
| McMillian: | Why you aint…why you and jump out and go? |
| Mitchum: | Cause we was at my crib.  We was..…. Bro, we was in front of my crib and this nigger Dee is tellin us that his wife is in (inaudible)… and this nigger shit is suspended and he got a warrant. |
| McMillian: | Aw man you nigger. |
| Mitchum: | So while we thinkin we like….cause you thinking like okay he's a licensed drive, we good.  Nigger, you would have pulled over at my crib too. |
| McMillian: | No the fuck I wouldn't, I'd a been out that bitch nigger.…then YEAH… Damn.  So what they doin with little brother man? |
| Mitchum: | Honestly I don't know.  I'm gonna go see his mom at six o'clock to talk to her cause I know she probably want to know what the fuck goin on, and I don't want to talk to her over the phone when I could talk to her face. |
| McMillian: | Why you aint..…Why you aint jump on that?  Why you let little brother jump on that man. |
| Mitchum: | Wha…what you mean why did I let him jump on it? |
| McMillian: | Word. …why he yeah...why he incarcerated? |
| Mitchum: | You want me…you want me to tell you the real reason why? |
| McMillian: | Yeah. |
| Mitchum: | Because once he told me everything that you asked that… I told him…I told… I was totally against it, I said nah bro it aint right....like this shit crazy out here, like you don't even need to move like that.  Dee the one who was tellin him like yeah fuck it, go ahead man, like we bout to ride whatever, and I'm like man you should'a.… like just ask Dee to ask him, I tell ya he in here right now, like you know what son, Trish told me to just leave it alone…leave it alone.  I'm like yo, bro like.… so you want them done for you right now but you know what niggers is grown as a bitch and they can make they own way…right, niggers is grown…I…I can't keep on tellin niggers good shit.  I'm the only nigger that tells niggers good shit, and niggers don't listen to me. |

(G. Ex. 2 at 18-19; Tr. 35-43).

Briganti testified that he believed that McMillian was explaining that he had

wanted Mitchum, not Reid, to retrieve his gun.  (Tr. 42).  According to Briganti, McMillian was

asking Mitchum why he had not fled from the car during the traffic stop and Mitchum was

explaining that he had not run because the stop had occurred in front of his residence.  (Tr. 43).

Briganti also testified that this conversation revealed that "Dee" had been driving the vehicle that

had been stopped on Rauber Street.  (*Id.*).  Based upon his experience and knowledge of the

investigation, Briganti believed that this conversation suggested that Reid had retrieved

McMillian's gun that was used in the Monson shooting from McDonald's house at 181 Durnan

Street on June 22, 2012.  (Tr. 43-44, 82-83).

Briganti testified that other conversations were also intercepted that he believed

implicated McDonald in criminal activity.  (Tr. 44).  For instance, on June 26, 2012 at 10:18

p.m., Simmons's brother, Devon Simmons, also known as "Eagle," called the target number and

spoke to Simmons.  (Tr. 44-45; G. Ex. 4 at 1).  During the conversation, they discussed "white

girl Tina," who, according to Briganti, was McDonald.  (Tr. 45-46, 74; G. Ex. 4 at 1).  Simmons

asked Devon whether someone had purchased scales; when Devon replied affirmatively,

Simmons told Devon to bring the scales to McDonald's house.[5]  (*Id.*).  Briganti testified that he

believed the scales were intended to be used to weigh narcotics.  (Tr. 74).

On July 5, 2012, text messages were intercepted between the target number and

McDonald's number.  (Tr. 46-47; G. Ex. 4).  During the exchange, the target number asked the

McDonald number, "Where u at"; the McDonald number replied, "Home"; the Simmons number

---

[5]  The conversation was transcribed as follows:

| | |
|---|---|
| Simmons: | Hello. |
| Devon: | Yo, what up? |
| Simmons: | What up, she came back with…from the store with the sh…with them scales .. |
| Devon: | Yeah.. |
| Simmons: | Bring em to um Tina house with me….please |
| Devon: | Who? |
| Simmons: | Tina… |
| Devon: | Who that is? |
| Simmons: | White girl Tina nigger. |
| Devon: | Oh, alright. (Eagle says in the background to Tina, "Ty said give me that shit….") |

(G. Ex. 4 at 1; Tr. 45-46).

responded, "Walk dwn the street bout to meet u."  (G. Ex. 4 at 2; Tr. 46-47).  The following day, at 2:44 p.m., a phone call was intercepted between Simmons and McDonald:

| McDonald:[6] | Hello? |
| Simmons: | Yo, where you at? |
| McDonald: | Home. |
| Simmons: | Yo, bring me one of them things like you did yesterday you know…bring it up to the corner store. |
| McDonald: | Come to the corner store? |
| Simmons: | Yeah. |
| McDonald: | On Durnan? |
| Simmons: | Man that's the only corner store close to you girl.  Stop acting crazy. |
| McDonald: | No.  There's one closer. |
| Simmons: | Man[].  The corner store you been fucking with. |
| McDonald: | I know I'm fucking with you.  I'm coming. |

(G. Ex. 4 at 3; Tr. 47-48).

Later that day, at 6:35 p.m., the target phone sent a text message to McDonald's phone stating, "U hme bring me one of them things out."  (Tr. 48; G. Ex. 4 at 4).  Briganti testified that he believed the phrase "one of them things" was a reference to narcotics, although he was unable to determine from the communications whether Simmons was referring to crack cocaine, marijuana or some other drug, or the quantity being discussed.  (Tr. 75-77).

Approximately an hour later, officers intercepted a phone call between Simmons and McDonald.  (Tr. 48-49).  During the call, Simmons advised McDonald that he was approaching her house and instructed her to bring him "one of them … um … the … the … five."  (Tr. 49; G. Ex. 4 at 5).  McDonald responded, "Like you just had?"  (*Id.*).  Simmons replied, "Nah, just … not … not …. Not like the one I just had.  One that have a full five in it."  (*Id.*).

---

[6] Briganti testified that he listened to the intercepted phone calls and was able to identify both Simmons's and McDonald's voices, although he was not able to confirm McDonald's voice until after he spoke to her during the execution of the search warrant at her residence.  (Tr. 50-51).

The following day, July 7, 2012 at 5:48 p.m., officers intercepted another phone call between the target number and McDonald's number.  (Tr. 49-51).  The following exchange occurred:

| | |
|---|---|
| McDonald: | Hello |
| Simmons: | Where you at |
| McDonald: | Shut up bitch hello I wasn't talkin to you |
| Simmons: | No you wasn't -- where you at |
| McDonald: | Laughter home |
| Simmons: | Hah |
| McDonald: | Home |
| Simmons: | Bring me out one of those things yo like yo brought earlier |
| McDonald: | All right |
| Simmons: | Let me know how many are in there |
| McDonald: | One and four |
| Simmons: | You got what? |
| McDonald: | One and four |
| Simmons: | All right |
| McDonald: | All right. |

(G. Ex. 4 at 6; Tr. 51-52).

Approximately one minute later another call from the target number to McDonald's number was intercepted.  (Tr. 52).  In that call, Simmons instructed McDonald, "Bring it all, bring, bring em all down.  Take back in bringin[g] all down real quick.  I'm outside your driveway.  Hurry up, white girl."  (Tr. 53; G. Ex. 4 at 7).  Approximately fifteen minutes later, another call between Simmons and McDonald was intercepted:

| | |
|---|---|
| McDonald: | Wow. |
| Simmons: | Yo? |
| McDonald: | Hello?  What? |
| Simmons: | Take one out of that five and bring it outta there.  Yeah. |
| McDonald: | You said take one out? |
| Simmons: | Yeah and bring it to me.  Bring me some rice too yo.  I'm about to be pulling in the yard like right now. |
| McDonald: | You said bring you some rice? |
| Simmons: | A little bit. |

(G. Ex. 4 at 8; Tr. 53).  The following day, the target phone texted McDonald's phone, "Bring me 2 of them things out."  (Tr. 54; G. Ex. 4 at 9).

Briganti testified that, based upon the communications and other information obtained during the investigation, he believed that the substance at issue was cocaine although the participants to the call did not explicitly identify the substance.  (Tr. 78-79, 89).  Briganti further testified, based on his experience, that drug traffickers use code language to communicate over the phone and that he had never known a drug trafficker to use the term "cocaine."  (Tr. 90).  Briganti also testified that drug traffickers typically stumble, pause, or stutter during phone conversations while trying to avoid using certain phrases.  (*Id.*).  According to Briganti, the phone calls between Simmons and McDonald were characterized by such pauses.  (*Id.*).

Briganti testified that the intercepted communications led him to believe that McDonald was holding quantities of narcotics for Simmons to sell.  (Tr. 54).  His belief was based in part on the nature of the phone calls, including the references to numbers without further specification.  (*Id.*).  According to Briganti, he believed that probable cause existed to arrest McDonald on July 10, 2012 for both drug trafficking and illegal possession of a firearm.  (Tr. 54-55, 83).  Briganti testified that some of the intercepted communications occurred while McDonald lived at 181 Durnan Street, but that she moved to 59 Ernst Street on June 25, 2012.  (Tr. 21-22, 84, 91-92).

**B.      Testimony of Worthey and Dunbar**

Worthey and Dunbar both testified that they lived at 59 Ernst Street and were present on July 10, 2012, when the search warrant was executed.  (Tr. 96-98, 121).  They also testified that their bedroom was at the top of the stairs on the left; McDonald's bedroom was down the hall.  (Tr. 101, 122).  According to Worthey and Dunbar, they had moved into 59 Ernst

Street approximately one or two weeks before the search.  (Tr. 100, 121).  When they first

moved in, they found two clear bags, each containing smaller bags, lodged in the windowsill of

their bedroom window.  (Tr. 101-02, 123-24).  Worthey and Dunbar testified that they used some

of the bags to hold their child's hair bows, barrettes, and beads, and that they placed the

remaining bags under the mattress to keep them out of their child's reach.  (Tr. 103-04, 124,

129-30).  Dunbar also testified that she used the bags to hold her earrings and earring backs.

(Tr. 124).


**II.      July 3, 2012 Search Warrant for 59 Ernst Street**

On July 3, 2012, Monroe County Court Judge Victoria M. Argento issued a

warrant to search McDonald's residence, 59 Ernst Street, Rochester, New York.  (Docket

# 192-1).  RPD Investigator David Swain ("Swain") submitted an affidavit in support of his

application for the search warrant.  (Docket # 192-2).  Swain stated that he had been involved in

an investigation of the activities of Simmons, McMillian, Mitchum, and Reid, and recounted the

phone conversations and text messages described *supra* that occurred between June 20 and June

26, 2012.[7]  (*Id.* at 4-20).  Swain's affidavit included an additional text message from McDonald

to Simmons on June 24, 2012, stating, "I got ur tool."  (*Id.* at 18).  According to Swain, based

upon his training and experience, he believed that McDonald was conveying to Simmons that

she had his gun.  (*Id.*).

According to Swain, the content of the communications provided probable cause

to believe that McDonald was storing and had previously stored for both McMillian and

Simmons guns, drugs, and paraphernalia to weigh and package drugs for distribution.  (*Id.* at 20).

---

[7]   The only exception is the June 21, 2012 phone call that occurred at 4:53 p.m., which was not included in
Swain's affidavit.

Swain further stated that records subpoenaed from Rochester Gas and Electric ("RG&E") demonstrated that McDonald received gas and electric service at 181 Durnan Street, Rochester, New York. (*Id.*). Additionally, Swain indicated that during the week of June 25, 2012, McDonald contacted RG&E and requested that her service be changed to 59 Ernst Street. (*Id.*). She also contacted DSS and reported that she had changed her address to 59 Ernst Street. (*Id.*). Additionally, a confidential informant told Morales that he or she "was helping a white girl named 'Tina' move into 59 Ernst Street from 181 Durnan Street." (*Id.*). According to the informant, "Tina" was moving to help her boyfriend "Ty." (*Id.*). Swain's affidavit further stated that he had observed Simmons exit the rear side door of 59 Ernst Street on July 2, 2012. (*Id.* at 21).

## III.   McDonald's Affidavit

In support of her suppression motion, McDonald submitted an affidavit stating that she was at her home located at 59 Ernst Street, Rochester, New York on July 10, 2012 when the warrant was executed. (Docket # 206 at ¶ 3). McDonald stated that she had smoked marijuana prior to the officers' arrival. (*Id.* at ¶ 4). According to McDonald, she was immediately placed into handcuffs and remained in handcuffs while law enforcement searched her home. (*Id.* at ¶ 3). She was subsequently transported to the Public Safety Building, where she provided a statement to the officers. (*Id.*). McDonald alleged that she did not recall being advised of her *Miranda* rights, did not recall waiving those rights, and believed that she had been under the influence of marijuana when she made her statement. (*Id.* at ¶ 4). According to McDonald, she was released without charges after she provided her statement. (*Id.* at ¶ 3).

16

## REPORT & RECOMMENDATION

### I.    McDonald's Warrantless Arrest

I turn first to McDonald's motion to suppress the statements she made to law enforcement officers after her arrest on July 10, 2012.  The government does not dispute that McDonald was in custody and subject to interrogation at the time she made the statements.  (Docket ## 353 at 1; 360 at 1).  Rather, McDonald contends that the officers lacked probable cause to arrest her on July 10, 2012 and that her statements should be suppressed as fruit of that unlawful arrest.[8]  (Docket ## 192 at ¶¶ 10-14; 353 at 2-6).  McDonald also maintains that any purported probable cause to arrest her was undercut by the absence of any narcotics, firearms or other evidence discovered during the execution of the warrant at her residence.  (*Id.*).

Probable cause to arrest exists when the arresting officer has "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime."  *United States v. Delossantos*, 536 F.3d 155, 158 (2d Cir.) (*Walczyk v. Rio*, 496 F.3d 139, 156 (2d Cir. 2007)), *cert. denied*, 555 U.S. 1056 (2008).  The Supreme Court has counseled that the probable cause standard is "a 'practical, nontechnical conception' that deals with 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'"  *Maryland v. Pringle*, 540 U.S. 366, 370 (2003) (quoting *Illinois v. Gates*, 462 U.S. 213, 231 (1983)).  In determining whether probable cause exists for an arrest, a reviewing court must examine the totality of circumstances surrounding the arrest,

---

[8]  I do not interpret McDonald's motions to challenge her statements on the grounds that they were involuntary or obtained in violation of *Miranda*.  Although her affidavit alleges that she was under the influence of marijuana when she made the statements and does not recall that *Miranda* warnings were provided to her, her submissions do not brief these issues.  In any event, Briganti credibly testified that *Miranda* warnings were provided to her by Morales, and no facts adduced at the hearing suggest that, even if she had used marijuana earlier, she was so intoxicated as to render her statements involuntary.

*Illinois v. Gates*, 462 U.S. at 230-31, judged from "the perspective of a reasonable police officer in light of his training and experience." *United States v. Delossantos*, 536 F.3d at 159.  Probable cause requires no more and no less than a "reasonable ground for belief of guilt."  *Maryland v. Pringle*, 540 U.S. at 371 (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)).

   In this case, Briganti testified about various conversations between several of the defendants prior to McDonald's arrest that, based upon his training, experience, and involvement in the investigation, implicated McDonald in activities involving narcotics trafficking and possession of a firearm.  With respect to the latter, Briganti described an investigation of the shooting of Monson, which had implicated McMillian as the shooter.  Briganti testified about communications between McMillian, Mitchum, Simmons, and Reid, described *supra*, that led him to believe that the gun used in the shooting was being stored at McDonald's house.  For example, he explained his interpretation of a conversation on June 22, 2012, in which McMillian instructed Reid to tell Mitchum to retrieve his gun from McDonald's house.  (Tr. 26-29; G. Ex. 2 at 11, 14).  Briganti's interpretation appeared to be corroborated by the seizure approximately three hours later of a gun from Reid, who was a passenger in a vehicle with Mitchum.  Forensic analysis of the gun determined that it had expelled the shell casings found in the location of Monson's shooting.  Briganti also testified that McMillian, Simmons, and Mitchum discussed the traffic stop and the seizure of the gun in a subsequent intercepted phone call.

   With respect to narcotics trafficking activity, Briganti testified about several communications between McDonald and Simmons, who the investigation had revealed was trafficking in cocaine (Tr. 89), that he believed suggested that she was storing narcotics at her house for Simmons.  In several of those communications, described *supra*, Simmons directed McDonald to meet him near her apartment and to bring "things" in varying quantities with her.

18

Briganti testified that he interpreted those conversations to reflect instructions from Simmons to

McDonald to supply him with various quantities of cocaine that were stored in her apartment.

Briganti explained that, in his experience, narcotics traffickers rarely identify narcotics by name

and frequently stutter or pause during conversations as they attempt to find other words.  Briganti

testified that the conversations between Simmons and McDonald were characterized by such

pauses and stutters.

   The information about which Briganti testified provided sufficient probable cause

to believe that McDonald was involved in firearms and narcotics offenses.  McDonald disagrees,

emphasizing that many of the communications are ambiguous.  Of course, as the Second Circuit

has recognized, "drug dealers rarely speak openly about their trade," and use of "narcotics code"

may support a probable cause finding.  *United States v. Cancelmo*, 64 F.3d 804, 808 (2d Cir.

1995); *see also United States v. Velasquez*, 271 F.3d 364, 372 (2d Cir. 2001) ("we have observed

that individuals dealing in cocaine utilize a variety of terms to refer to the illegal substance")

(collecting cases), *cert. denied*, 535 U.S. 965 (2002); *United States v. Davis*, 2013 WL 322122,

*5 (M.D. Ala.) ("an issuing judge 'may consider an agent's training and experience to offer

opinions as to methods utilized by drug traffickers and, based on the same, consider an agent's

interpretation of code words and language in determining whether . . . probable cause exists"),

*report and recommendation adopted*, 2013 WL 10722803 (M.D. Ala. 2013), *aff'd*, 611 F. App'x

961 (11th Cir.), *cert. denied*, 2015 WL 5610749 (2015) (quoting *United States v. Flores*, 2007

WL 2904109 (N.D. Ga. 2007)).

   Here, Briganti testified at length about the communications and explained his

interpretation of the language McDonald characterizes as ambiguous.  In addition, some of his

interpretations were apparently corroborated by the traffic stop of Reid and Mitchum and the

seizure of a gun used in the Monson shooting.  Under these circumstances, I conclude probable

cause existed to arrest McDonald on July 10, 2012.  *See United States v. Fury*, 554 F.2d 522,

530-31 (2d Cir. 1977) (probable cause shown where ambiguous statements could be "reasonably

interpreted to indicate what the detective interpreted them to be" when considered in context of

defendant's criminal record and ongoing investigation); *United States v. Osiomwan*, 2013 WL

2458459, *6 (D. Md. 2013) ("[t]he coded language in the wiretapped calls indicated that

[defendant] was conspiring with [another individual] to distribute heroin[;] . . . [t]hese facts are

sufficient for a reasonable person to believe the offense had been committed"), *aff'd*, 593

F. App'x 194 (4th Cir. 2014); *United States v. Kazarian*, 2012 WL 1810214, *8 (S.D.N.Y. 2012)

("[w]hile [defendant] argues that the words 'check,' 'bank,' or 'dollars,' were never used, a

finding of probable cause is not precluded merely because 'many of the conversations were in

vague and coded language'") (quoting *United States v. Bellomo*, 954 F. Supp. 630, 638 n.3

(S.D.N.Y. 1997)); *United States v. Felix*, 2011 WL 7404389, *11 (W.D.N.Y. 2011) (officer's

interpretation that conversations involving defendant "related to the care and maintenance of a

marijuana grow operation" supported probable cause finding), *report and recommendation

adopted*, 2012 WL 566886 (W.D.N.Y. 2012); *United States v. Lighten*, 2010 WL 3853307, *3

(W.D.N.Y.) ("[t]he evidence shows that probable cause arose not merely because of the coded

telephone call, but also subsequent surveillance of [defendant] and further phone calls

confirming a meeting by the confidential informant and [defendant] for the informant to

purchase drugs from [defendant]"), *report and recommendation adopted*, 2010 WL 3834572

(W.D.N.Y. 2010).

       Further, I conclude that the probable cause to arrest McDonald did not dissipate

because the search of her residence failed to uncover tangible evidence of either drug trafficking

or gun possession.  As an initial matter, the record does not reveal whether the search had concluded prior to McDonald's interview.  In any event, as discussed above, probable cause is evaluated based upon the totality of the circumstances, and the failure of law enforcement to uncover plainly incriminating evidence in McDonald's residence is but one factor in the calculus.

As discussed above, probable cause existed to believe that McDonald had committed the crime of unlawful possession of a firearm based upon conversations about the need to retrieve McMillian's gun from McDonald's residence.  Briganti further testified that the suspected gun was in fact seized on June 22, 2012.  Further, although the investigating officers reasonably believed, based upon a series of conversations occurring between June 26 and July 7, 2012, that McDonald was storing cocaine and other drug trafficking paraphernalia at her house, the fact that no such evidence was recovered – perhaps because it had been depleted or moved – does not nullify the probable cause to believe that McDonald was involved in Simmons's drug activities.  Accordingly, I recommend that the district court deny McDonald's motion to suppress her post-arrest statements.


## II.   <u>Validity of Search Warrant for 59 Ernst Street</u>

McDonald also contends that the July 3, 2012 search warrant for her residence at 59 Ernst Street was unsupported by probable cause.  (Docket # 192 at ¶¶ 4-9).  She argues that the application did not establish a sufficient nexus between 59 Ernst Street, Rochester, New York and the allegedly illegal activity described in the warrant.  (*Id.*).  According to McDonald, the June 2012 intercepted conversations relied upon in the application occurred while she lived at 181 Durnan Street.  (*Id.*).  Thus, McDonald maintains that the warrant lacked probable cause because it was not based upon any evidence of illegal activity occurring at 59 Ernst Street.  (*Id.*).

The Fourth Amendment to the Constitution provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV; *see also* Fed. R. Crim. P. 41.  In *Illinois v. Gates*, 462 U.S. at 213, the Supreme Court affirmed the "totality of the circumstances" test to determine whether a search warrant satisfies the Fourth Amendment's probable cause requirement.  According to the Court, the issuing judicial officer must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238.  A reviewing court's obligation is merely to determine that the issuing judge had a "'substantial basis for...conclud[ing]' that probable cause existed." *United States v. Smith*, 9 F.3d 1007, 1012 (2d Cir. 1993) (quoting *Gates*, 462 U.S. at 238-39) (internal quotation omitted); *Walczyk v. Rio*, 496 F.3d at 157 ("a reviewing court must accord considerable deference to the probable cause determination of the issuing magistrate").  Moreover, "resolution of doubtful or marginal cases should be largely determined by the preference to be afforded to warrants." *United States v. Smith*, 9 F.3d at 1012 (citing *Jones v. United States*, 362 U.S. 257, 270 (1960)).

I conclude that the information contained in Swain's affidavit provided sufficient probable cause to believe that evidence of cocaine trafficking and criminal possession of a firearm would be found in McDonald's residence.  McDonald maintains that the absence of direct evidence of criminal activity at her new residence at 59 Ernst Street renders the warrant invalid.  I disagree.  A "showing of nexus does not require direct evidence and 'may be based upon "reasonable inference" from the facts presented based on common sense and experience.'"

*United States v. Singh*, 390 F.3d 168, 182 (2d Cir. 2004) (quoting *United States v. Buck*, 1986 WL 12533, *4 (S.D.N.Y. 1986), *rev'd on other grounds*, 813 F.2d 588 (2d Cir. 1987)).  Swain's affidavit set forth a reasonable basis to believe that McDonald had recently moved to a new apartment at 59 Ernst Street and that Simmons had visited that location.  In this case, common sense supports the reasonable inference that McDonald moved her property, including any illegal narcotics, narcotics trafficking paraphernalia, or firearms, to her new residence.  *See United States v. Felder*, 457 F. App'x 316, 323 (4th Cir. 2011) (probable cause to believe evidence of narcotics and weapons observed in defendant's former residence would be found in defendant's new residence) (citing *United States v. Grossman*, 400 F.3d 212, 218 (4th Cir. 2005) ("[i]t is reasonable to suspect that a drug dealer stores drugs in a home to which he owns a key")); *United States v. Clark*, 2014 WL 875827, *2 (D. Neb. 2014) ("[b]ased on common sense, the officer and the issuing judge reasonably assumed the defendant moved his personal property when he move[d] to a new residence"); *United States v. Mire*, 2011 WL 4703183, *7 (S.D. Ind. 2011) ("the search warrant application in this case sought to search [defendant's] residence in order to discover[] a variety of items that law enforcement would expect to find in the residence of someone engaging in on-going drug trafficking[;] [i]t was entirely reasonable to expect that any such items that [defendant] had at his old apartment would have been moved to his new apartment"); *United States v. Costello*, 596 F. Supp. 2d 1060, 1069 (E.D. Mich. 2009) ("[t]here is reason to think that when a person moves, he would bring with him most of his possessions").  Accordingly, I conclude that Swain's affidavit set forth sufficient facts supporting probable cause to believe that evidence relating to narcotics trafficking or possession of firearms would be found at McDonald's residence.  *See United States v. Felder*, 457 F. App'x at 323; *United States v. Mire*, 2011 WL 4703183 at *7 (probable cause to search defendant's new residence for

evidence of narcotics trafficking; "the information contained in the search warrant affidavit was not stale simply because it was acquired before law enforcement was aware that [defendant] had moved to a new apartment").

In any event, there is no evidence to suggest that the searching officers did not rely upon the warrant in good faith. *See United States v. Leon*, 468 U.S. 897 (1984); *United States v. Clark*, 2014 WL 875827 at *2 (applying good faith exception to exclusionary rule where search warrant authorized search of defendant's new residence). No credible evidence exists that the issuing judge was knowingly misled or wholly abandoned her judicial role. *See United States v. Leon*, 468 U.S. at 923. Nor was the warrant so facially deficient or so lacking in probable cause that reliance upon it would have been unreasonable. *See id.*; *Clark*, 2014 WL 875827 at *2. Accordingly, I recommend that McDonald's motion to suppress evidence seized from 59 Ernst Street, Rochester, New York be denied.

## CONCLUSION

For the reasons stated above, I recommend that the district court deny McDonald's motions to suppress statements and tangible evidence. (**Docket ## 192, 353**).

**IT IS SO ORDERED.**

                                                   *s/Marian W. Payson*
                                                 _____
                                                  MARIAN W. PAYSON
                                                United States Magistrate Judge

Dated: Rochester, New York
         November 10, 2015

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report and Recommendation in accordance with the above statute and Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York.[9]

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but was not, presented to the magistrate judge in the first instance. *See*, *e.g.*, *Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 59(b) of the Local Rules of Criminal Procedure for the Western District of New York, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 59(b) may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the parties.

**IT IS SO ORDERED.**

_s/Marian W. Payson_
MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
November 10, 2015

---

[9]  Counsel is advised that a new period of excludable time pursuant to 18 U.S.C. § 3161(h)(1)(D) commences with the filing of this Report and Recommendation.  Such period of excludable delay lasts only until objections to this Report and Recommendation are filed or until the fourteen days allowed for filing objections has elapsed. *United States v. Andress*, 943 F.2d 622 (6th Cir. 1991); *United States v. Long*, 900 F.2d 1270 (8th Cir. 1990).